DAVID ROBINSON *et al.*

*v.*

MARTHA J. RUPRECHT *et al.*

*Opinion filed June 19, 1901—Rehearing denied October 23, 1901.*

1. COURTS—*when State court properly declines to delay cause until termination of suit in Federal court.* A State court properly declines to delay a suit until the termination of a prior suit in the United States court involving the same question, where the suit in the State court is for the partition of real estate whereas the suit in the Federal court relates to the personal property only, and where the parties to the suits are not identical, and the determination of either suit does not involve any conflict of authority between the respective courts.

2. ILLEGITIMATES—*when presumption that husband is the father of wife's children does not prevail.* The presumption that the legal husband of a woman is the father of her children cannot prevail where it appears from the evidence that in the course of nature he could not have been the father of them.

3. SAME—*statute respecting illegitimates applies to all illegitimate children.* The provisions of sections 2 and 3 of the Statute of Descent, relating to illegitimates, apply to all illegitimate children, even those born of parents who at the time of the conception and birth of such children were living in a state of adultery, in violation of their marriage vows and the laws of the State.

4. MARRIAGE—*an originally meretricious relation may be shown to have become matrimonial.* While the presumption is that a cohabitation which was meretricious in its inception continues to be so, yet it may be shown by proof, either direct or circumstantial, that the cohabitation has lost its wrongful character and become matrimonial in intent.

5. SAME—*when a valid common law marriage is shown.* A common law marriage valid in this State is established where, although at the time of the celebration of the supposed marriage the man

knew that he had a legal wife living and the woman had a husband living whom she in good faith supposed to be dead, the parties continued to cohabit as husband and wife, publicly conducting and announcing themselves as such and acknowledging their offspring as their children after receiving knowledge that the man's legal wife was dead and after the woman's legal husband had died; and in such case the children are rendered legitimate, under the statute.

CARTWRIGHT and HAND, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

S. S. GREGORY, JOHN C. SPOONER, and A. L. SANBORN, for appellants:

Cohabitation originally illicit is presumed to so continue until a change therein is shown. *Cartwright* v. *Mc-Gown*, 121 Ill. 388; *Collins* v. *Voorhees*, 14 L. R. A. 364; *Cole* v. *Cole*, 153 Ill. 585; *Badger* v. *Badger*, 88 N. Y. 546; *Williams* v. *Williams*, 46 Wis. 464; *Floyd* v. *Calvert*, 53 Miss. 37; *Insurance Co.* v. *Riegal*, 113 Pa. St. 294; *Cargile* v. *Wood*, 63 Mo. 501.

Where persons are born illegitimate, the subsequent marriage of their parents does not legitimate them unless at the time of conception or birth the parents could lawfully intermarry. Rev. Stat. chap. 39, sec. 3; chap. 17, sec. 15; *Marionneaux* v. *Dupuy*, 48 La. Ann. 496; 1 Blackstone's Com. 455; 2 Domat, sec. 2510; 4 Gibbon's Rome, 482, chap. 44; Dwight on Law of Persons, 257; 2 Kent's Com. 209; 2 Pingrey on Real Prop. sec. 1143; 1 Rapalje & Lawrence's Law Dic. 118; 1 Dembitz on Land Titles, 287; 2 Am. & Eng. Ency. of Law, 895; *Sams* v. *Sams*, 85 Ky. 396; *Cope* v. *Cope*, 137 U. S. 682; *People* v. *Gaulter*, 149 Ill. 39; *Garland* v. *Harrison*, 8 Leigh, 368; Fraser on Parent and Child, 36; Sutherland on Stat. Const. sec. 246; *Scanlon* v. *Walsh*, 81 Md. 118; *Dalrymple* v. *Dalrymple*, 2 Hagg. 54.

Where the proof shows that the children of a married woman are not the children of her husband, there can be no presumption that they are the legitimate children of her paramour, nor any presumption of subsequent legitimation in jurisdictions where this is permitted by law;

hence there is in this case no presumption of legitimacy which contesting appellees can invoke.   1 Blackstone's Com. 457, note 19; 1 Greenleaf on Evidence, sec. 28, note *c;* 2 Pingrey on Real Prop. sec. 1145; *Regina* v. *Mansfield,* 1 Q. B. 444.

Where cohabitation, matrimonial in form, is commenced under a marriage void, and known to be void by either party, by reason of an impediment to a valid marriage between them, the removal of the impediment will not change the relation from meretricious to matrimonial cohabitation, but there must be a subsequent interchange of matrimonial consents, or actual marriage, after the removal of the impediment.   Such marriage is not shown by continued cohabitation and repute of marriage, accompanied with a general admission and declarations by either or both parties that they are husband and wife. *Cartwright* v. *McGown,* 121 Ill. 388; *Dalrymple* v. *Dalrymple,* 2 Hagg. 54; *George* v. *Thomas,* 10 Up. Can. 604; *Crymble* v. *Crymble,* 50 Ill. App. 544; 1 Bishop on Mar., Div. and Sep. secs. 961, 970, 985; *Wright* v. *Wright,* 48 How. Pr. 1; *O'Gara* v. *Eisenlohr,* 38 N. Y. 296; *Brinkley* v. *Brinkley,* 50 id. 184; *Badger* v. *Badger,* 88 id. 546; *Foster* v. *Hawley,* 8 Hun, 68; *Queen* v. *Millis,* 10 C. & F. 534; *Randlett* v. *Rice,* 141 Mass. 385; *Beamish* v. *Beamish,* 9 H. L. C. 274; *Norcross* v. *Norcross,* 155 Mass. 425; *Peck* v. *Peck,* 155 id. 479; *Barnum* v. *Barnum,* 42 Md. 251; *Rose* v. *Rose,* 67 Mich. 213.

Where the jurisdiction of a court and the right of plaintiff to prosecute therein have once attached, that right cannot be arrested or taken away by proceedings in another court.   *Munson* v. *Harroun,* 34 Ill. 422; *Bank* v. *Hazard,* 49 Fed. Rep. 293; *Logan* v. *Lucas,* 59 Ill. 237.

FRANK IVES, and VINCENT D. WYMAN, for appellees:

If the words of a statute are free from ambiguity and doubt, and no intention contrary to that expressed appears in other parts of the statute, there is no occasion for interpretation.   A bare reading suffices.   Sutherland

on Stat. Const. secs. 234-237, and cases cited; *Gas Co.* v. *Downey*, 127 Ill. 201; *Martin* v. *Swift*, 120 id. 488.

"Illegitimate" means begotten and born out of lawful wedlock, and includes all bastards, whether the fruit of fornication, adultery or incest. *Blythe* v. *Ayers*, 96 Cal. 532; *Brewer* v. *Blougher*, 14 Pet. 178; *Cope* v. *Cope*, 137 U. S. 682; 3 Am. & Eng. Ency. of Law, (2d ed.) 895; 2 Kent's Com. 208, 209; 1 Blackstone's Com. 454, 455; *Miller* v. *Miller*, 18 Hun, 507.

Where a legislature enacts what purports to be a complete act of descents, all former rules of inheritance are abrogated. It will be presumed the legislature intended to provide for every possible case, and neither the common nor civil law can be resorted to to determine the construction to be given the statute. *Ives* v. *McNicoll*, 53 N. E. Rep. 60; *Brown* v. *Turberville*, 2 Call. 390; *Templeman* v. *Steptoe*, 1 Munf. 338; *Davis* v. *Rowe*, 6 Rand. 355; *Garland* v. *Harrison*, 8 Leigh, 368.

Unless it is clearly stated that adulterine bastards are excepted from the operation of a legitimation statute it cannot be held such an unjust exception was intended. The legislature has not made the right of a child to inherit depend upon the degree of guilt of his parents. *Ives* v. *McNicoll*, 53 N. E. Rep. 60; *Hawbecker* v. *Hawbecker*, 43 Md. 516; *Blythe* v. *Ayers,* 96 Cal. 531; *Carroll* v. *Carroll*, 20 Tex. 731.

When a marriage in fact is shown, the law raises a strong presumption of its legality, and the burden is cast upon the objecting party to establish its invalidity, even though that require the proof of a negative. *Jones* v. *Gilbert*, 135 Ill. 27; *Johnson* v. *Johnson*, 114 id. 611; *Schmisseur* v. *Beatrie*, 147 id. 210; *Cartwright* v. *McGown*, 121 id. 388; *Coal Co.* v. *Jones*, 127 id. 379.

The law presumes innocence—not guilt. So that when the second marriage of a person is shown, and it is established the former spouse was then living, the law will presume the first marriage was dissolved by divorce.

This presumption is strengthened by the fact that the parties to the first marriage have both re-married, and by the long lapse of time. And stronger proof to rebut the presumption is required where both parties are dead and the legitimacy of their children is in issue. It is not rebutted by mere proof the first spouse did not obtain a divorce. *Non constat,* the other may have done so. *Johnson* v. *Johnson,* 114 Ill. 611; *Cartwright* v. *McGown,* 121 id. 388; *Coal Co.* v. *Jones,* 127 id. 379; *Jones* v. *Gilbert,* 135 id. 27; *Schmisseur* v. *Beatrie,* 147 id. 210; *Boulden* v. *McIntyre,* 119 Ind. 574;. *Wile's Estate,* 6 Pa. Sup. Ct. 435; *Harris* v. *Harris,* 8 Ill. App. 57; *Blanchard* v. *Lambert,* 43 Iowa, 228; *Hull* v. *Rawls,* 27 Miss. 471; *Carroll* v. *Carroll,* 20 Tex. 731; *Leach* v. *Hall,* 64 N. W. Rep. 790; *In re Edwards,* 58 Iowa, 431.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery filed in the circuit court of Cook county to partition the real estate of which Curtis E. Robinson, Sr., died seized. The appellants, a brother, a sister and four nieces of the said deceased, filed the bill, and therein alleged that said deceased left neither widow, child, children, descendants of child or children, father or mother, him surviving, and that they and the appellee Nathan S. Robinson, a brother of said deceased, (who refused to join in the bill as a complainant and was thereupon made a defendant,) were the only legal heirs of said deceased, and were, under the statutes of descent, the owners, as tenants in common, of the real estate of which he died seized. The bill alleged the appellees (except said Nathan S.) claimed to be the lawful children and only legal heirs of said deceased. The relief asked by the bill was, that the legal title to the real estate of which the said deceased was the owner should be declared to be in the complainants and said Nathan S., as tenants in common, and that a decree in partition be entered allotting it to them in severalty, according to their alleged respective interests therein.

Prior to the institution of the suit for partition the appellants, as complainants, filed in the Circuit Court of the United States for the Northern District of Illinois a bill in chancery against these appellees, (except said Nathan S. Robinson, who was not made a party complainant or defendant to the proceeding in the United States court,) Charles Steinbrecher and Theodore Schintz. Before the case at bar was reached for hearing in the trial court, counsel for appellants moved to stay further proceedings therein until the cause pending in the Circuit Court of the United States could be heard and disposed of in the Federal court. The ground of the motion was that the two cases involved the same question, and that that in the United States court was the prior proceeding. The denial of the motion by the court is complained of as error. The proceeding in the United States court related only to the personal property of the estate of the said Curtis E. Robinson, Sr. The proceeding at bar has relation only to the real estate. The parties in the two actions were not the same. The prosecution to a final termination of either suit did not involve any conflict of authority between the respective courts in which the suits were pending. It was not error in the State court to decline to await the termination of the litigation in the Federal court.

The circuit court of Cook county proceeded to the disposition of the cause pending before it, and after a full hearing entered a decree declaring the said deceased left him surviving the appellees, Martha J. Ruprecht, Bessie L. Howison and Curtis E. Robinson, Jr., his children and only heirs-at-law, and ordered that the bill for partition of the premises filed by the appellants be dismissed. This is an appeal to bring the decree of the circuit court in review in this court.

In 1869 said Curtis E. Robinson, Sr., without pretense of marriage, began living and cohabiting with one Johannah Schoeninger in the city of Chicago as though the

relation of husband and wife existed between them. The appellee Martha Ruprecht (*nee* Robinson) was born June 22, 1870, while this illicit relation continued. On the 24th day of April, 1873, the said Curtis E., Sr., applied to the clerk of the county court of McHenry county, Illinois, for a license authorizing the ceremonies of marriage to be celebrated between himself and said Johannah. A license was issued accordingly, and on the same day the marriage was celebrated between them before a justice of the peace of said McHenry county. They continued to live and cohabit together as husband and wife until the death of said Johannah, which occurred April 14, 1891,— a period of eighteen years. They lived during all these years in the city of Chicago and deported themselves as husband and wife. Curtis E., Sr., survived Johannah but about a year, and died April 20, 1892. The appellees Curtis E., Jr., and Bessie L. Howison, were born to them after the celebration of the marriage. Prior to the celebration of the marriage both parties thereto had been previously married. Mary J., the wife of said Curtis E., Sr., by the prior marriage, whom he had separated from in the State of Massachusetts, was then living and un-divorced, as he well knew. Gottlieb Schoeninger, the husband of said Johannah, was then, in fact, living some-where in the State of Pennsylvania, but it seems to be well established she had been informed, and upon rea-sonable grounds believed, that he was dead, and in good faith believed she had full right to enter into the mar-riage relation. On December 27, 1875, Mary J., the legal wife of said Curtis E., Sr., departed this life at her home in the State of Massachusetts, and within a few months thereafter appellee Nathan S. Robinson came from Mas-sachusetts to Chicago and informed said Curtis E., Sr., and said Johannah, that said Mary J. was dead. Gott-lieb Schoeninger, husband of said Johannah, survived until the 13th day of May, 1890, at which date he died at Nazareth, Pennsylvania. He had entered into marriage

with another woman in 1870, at Easton, Pennsylvania. The fact said Schoeninger was living at the time of their marriage in McHenry county never reached either said Curtis E., Sr., or said Johannah. Both died resting under the belief which they entertained at the time of the celebration of the marriage between them in McHenry county in 1873, that he had died previous thereto.

The cohabitation of said Curtis E., Sr., and said Johannah, was meretricious in its inception. The celebration of the marriage contract between them in 1873, in McHenry county, did not change their adulterous relation, for the reason the said Curtis E., Sr., had, as he well knew, a legal wife. They, however, continued to live together as husband and wife for nearly sixteen years after the death of said Mary J., the wife of said Curtis E., Sr., and for about a year after the death of Gottlieb, whose death removed the only impediment to their legal marriage. Their children, Martha, Curtis E., Jr., and Bessie, the appellees, were treated and acknowledged by both parents as true and lawfully begotten children during all those years. Sections 2 and 3 of chapter 39 of our statutes, entitled "Descent," (Hurd's Stat. 1899, p. 653,) are as follows:

"Sec. 2. An illegitimate child shall be heir of its mother and any maternal ancestor, and of any person from whom its mother might have inherited, if living; and the lawful issue of an illegitimate person shall represent such person, and take, by descent, any estate which the parent would have taken, if living.

"*Second*—The estate, real and personal, of an illegitimate person, shall descend to and vest in the widow or surviving husband and children, as the estate of other persons in like cases.

"*Third*—In case of the death of an illegitimate intestate, leaving no child or descendant of a child, the whole estate, personal and real, shall descend to and absolutely vest in the widow or surviving husband.

"*Fourth*—When there is no widow or surviving husband, and no child or descendants of a child, the estate of such person shall descend to and vest in the mother and her children, and their descendants—one-half to the mother, and the other half to be equally divided between her children and their descendants, the descendants of a child taking the share of their deceased parent or ancestor.

"*Fifth*—In case there is no heir as above provided, the estate of such person shall descend to and vest in the next of kin to the mother of such intestate, according to the rule of the civil law.

"*Sixth*—When there are no heirs or kindred, the estate of such person shall escheat to the State, and not otherwise.

"Sec. 3. An illegitimate child, whose parents have intermarried, and whose father has acknowledged him or her as his child, shall be considered legitimate."

The law raises the presumption that Gottlieb, the legal husband of said Johannah, was the father of her children. The presumption is not, however, conclusive, but is rebuttable. It appeared in the proof that there was no possibility of access to the mother on the part of the said Gottlieb at the time of the conception of either of these appellee children. In the course of nature he could not have been the father of either of them. In such state of case the presumption cannot prevail. (1 Greenleaf on Evidence, sec. 128, note *c;* 3 Am. & Eng. Ency. of Law,—2d ed.—876, 877.) The said Curtis E., Sr., was properly regarded by the chancellor as the father of the appellees, Martha J. Ruprecht, Curtis E. Robinson, Jr., and Bessie L. Howison.

The contention of the appellants is, that if it be conceded the said Curtis E., Sr., was the father of said appellees, they were at birth illegitimate; that they were begotten and born while their parents were living in a state of adultery, and for that reason said section 3 does

not apply to them. The argument is, that at the common
law legitimation of children born out of wedlock was
unknown, and that all legislation admitting illegitimate
children to the right of succession, being in derogation
of the common law, must be strictly construed, and hence
that such legislation should not be construed to apply
to children born of parents who, at the time of the con-
ception and birth of such children, in violation of their
marriage vows and of the Criminal Code of the State,
were living in a state of adultery. Counsel cite as in
support of their position, 2 Pingrey on Real Prop. 1143,
1 Rapalje & Lawrence's Law Dic. 118, title "Bastardy,"
and *Sams* v. *Sams*, 85 Ky. 396. But we think the weight
of authority, as well as by far the better reason, is op-
posed to this view. (*Carroll* v. *Carroll*, 20 Tex. 731; *Haw-
becker* v. *Hawbecker*, 43 Md. 516; *Blythe* v. *Ayers*, 96 Cal. 532;
Schouler on Domestic Relations, 226; *Ives* v. *McNicoll*, 53
N. E. Rep. 60; *Sutphin* v. *Cox*, 1 West. Law Monthly, 346.)
The rule of the common law was, that every bastard,
whether the fruit of adulterous, incestuous or other man-
ner of intercourse not sanctioned by wedlock, was deemed
to be of kin to no one, and therefore not capable of in-
heriting from any one, nor of having heirs, except of his
own blood, who could inherit from him. (*Blacklaws* v.
*Milne*, 82 Ill. 505; *Stoltz* v. *Doering*, 112 id. 234; 4 Kent's
Com.—13th ed.—445; 3 Am. & Eng. Ency. of Law, 892.)
The common law of England recognized no mode of legit-
imating bastards except by a special act of parliament.
(4 Kent's Com.—13th ed.—note 4 to p. 445; 3 Am. & Eng.
Ency. of Law,—2d ed.—p. 896.) In the absence of statu-
tory enactments the common law rule would be the law
in Illinois. (*Stoltz* v. *Doering*, *supra*.) The rule visited the
sins of the parents upon the unoffending offspring, and
could not long survive the truer sense of justice and
broader sense of charity that came with the advancing
enlightenment and civilization of the race.

Sections 2 and 3 of our Statute of Descent were enacted for the purpose of obviating the undue severity of the common law and of erecting a rule more consonant with justice to an innocent and unfortunate class. Section 2 of the act relates to the capacity of illegitimates to inherit and to the capacity of others to inherit from them. It abrogates the common law rule that an illegitimate is the child of nobody, and could not take property by inheritance even from its own mother. Section 3 was adopted for the purpose of providing a mode by which the same class of persons referred to in section 2,—illegitimates,—could be legitimated. The same words, "illegitimate child," are used in both sections, and we know of no rule of construction, and certainly there is no reason, requiring a different meaning should be given to the words in one section to that given them in the other. Section 3 enables parents to intermarry when they may legally do so, and acknowledge their offspring born prior to the legal celebration of their union, and we do not see the force of the reasoning that would so restrict the meaning of the section as to exclude from its operation parents, one or the other of whom has violated his or her marriage obligations in the procreation of the child. The child of such parents is not less innocent or unoffending than the child of parents who were unmarried at the time of the copulation, and the ground upon which the insistence is based a distinction should be made,—that the child shall be punished for the sins of the parents,— shocks every sense of justice and right. The degree of moral or criminal delinquency of the parents does not enter into consideration in construing the section. (See *Brewer* v. *Blougher*, 9 Pet. 178; *Blythe* v. *Ayers*, 96 Cal. 532.) It was not the legislative intent to exclude from the benefits of said sections 2 and 3 any illegitimate person.

It follows, then, that said appellees, Martha J. Ruprecht, Curtis E. Robinson, Jr., and Bessie L. Howison, were properly regarded by the chancellor as the offspring

of the said Curtis E., Sr., deceased, and that though illegitimate by birth, they were legitimated and became his legal heirs if the legal relation of husband and wife afterwards existed between their parents and the said Curtis E., Sr., acknowledged them as his children. That he did so acknowledge them cannot be the subject of controversy. He was to them a kind and indulgent father, and the record abounds in proof of acts and words of his which placed all question of his acknowledgment of them as his children beyond doubt or debate.

There was no proof marriage vows were celebrated between said Curtis E., Sr., and said Johannah, in accordance with the requirements of the statute with relation to marriages, except the marriage in McHenry county. The McHenry county marriage was illegal, for said Curtis E., Sr., at that time had a living wife and said Johannah a living husband. The connection between them was in its inception meretricious, and the presumption of their innocence and morality was at once rebutted. The presumption is that a cohabitation meretricious in its inception continues meretricious; but that the evil purpose of the parties subsequently changed and that the cohabitation lost its wrongful character and became matrimonial in intent and character may be shown by proof, direct or circumstantial.

It may be here noted as a distinction between this cause and that of *Cartwright* v. *McGown*, 121 Ill. 388, that in the latter case Lewis married Zerelday Cacey with full knowledge he was then the husband of a living wife, and never thereafter obtained information that this impediment to a lawful union with Zerelday had been removed by the decree of divorce granted to his legal wife in Kentucky, but that his cohabitation with Zerelday remained always meretricious so far as he was concerned, and for that reason it was held the presumption that a legal marriage was celebrated between said Lewis and said Zerelday after the granting of the decree of divorce

did not arise. The formal statutory celebration of marriage between said Curtis E., Sr., and said Johannah, indicated that it was their desire their subsequent connection should be considered and understood to be matrimonial. They in good faith, so far as this record discloses, at the time of the marriage believed that Johannah was a widow and might lawfully marry, but Curtis E., Sr., at least, knew that he then had a living wife and could not lawfully enter into another marriage union. In 1875,— about two years after this formal marriage,—Mary J., the wife of said Curtis E., Sr., died, and within a few months thereafter said Curtis E., Sr., and Johannah, were advised that said Mary J. was no longer living. They then believed there was no impediment to their legal union as husband and wife. There is no direct proof they subsequently entered into a statutory marriage, but their actions, conduct, their cohabitation and repute, were foreign to and inconsistent with any relation other than that of husband and wife, and there can be no doubt but that after the death of said Mary J. the cohabitation between said Curtis E., Sr., and said Johannah, was matrimonial in the intent and belief of both of them. Their actions, life and repute from thenceforth during the remainder of their lives were those of husband and wife. The impediment to that legal relation was removed May 13, 1890, by the death of said Gottlieb, the husband of said Johannah. There is no proof on the question whether they were or were not advised of his death. They believed that he was dead when the ceremony of marriage was performed in McHenry county, in 1873, and so far as the record discloses were never advised to the contrary. Johannah lived nearly a year after the death of Gottlieb and died April 14, 1891, and said Curtis E., Sr., survived Johannah but about one year. It was lawful after the death of Gottlieb for them to enter into the marriage relation. They believed their cohabitation was matrimonial, intended it should be so, and the presump-

tion of marriage from cohabitation apparently matrimonial became applicable to their relation as husband and wife in aid of the legitimacy of their children.

The chancellor found "that the said Curtis E. Robinson, Sr., and Johannah Robinson lawfully intermarried at some time between May 13, 1890, (the date of the death of Gottlieb Schoeninger,) and April 14, 1891; that both before and after such intermarriage, and until his death, the said Curtis E. Robinson, Sr., continuously acknowledged the said Curtis E. Robinson, Jr., Martha J. Ruprecht, (formerly Robinson,) and Bessie L. Howison, (formerly Robinson,) and each of them, as his legitimate children." This finding is amply supported by the proofs. They were, during that period, living in their residence on Wabash avenue. The acts of each toward the other were those of husband and wife, and to said Martha J., Curtis E., Jr., and Bessie L., their children, who were members of the family, they deported themselves as father and mother. Their whole life was inconsistent with any other relation than that of husband and wife. A few months after the death of said Gottlieb Schoeninger, they, with the appellee children, visited the relatives of the husband, in Massachusetts. Curtis E., Sr., introduced Johannah to his kindred as his wife and the appellee children as their children. He manifested parental pride in the children, was anxious the appellee daughters should exhibit their proficiency in music to his kindred, and declared his satisfaction that through appellee Curtis E., Jr., his name would be perpetuated. A family reunion was held at the house of his brother, Nathan S., at which Curtis E., Sr., Johannah and the appellee children attended as a family. Johannah manifested a sympathetic feeling for some of the relatives of Curtis E., Sr., and made them gifts of money and other articles, and when she and said Curtis E., Sr., returned to their home in Chicago they brought with them the mother of Curtis E., Sr., an aged woman, who lived with

them in their home on Wabash avenue, as a member of their family, during the remainder of her life. They also invited Nathan S. Robinson and his daughter, Eunice, to visit them in Chicago. The invitation was accepted, and they were entertained as relatives in their home on Wabash avenue. A pew was rented in the South Park Avenue Church, and Curtis E., Sr., and Johannah attended services together there. Deeds were executed conveying to them property as husband and wife, naming them as such, and they uniformly treated and called each other husband and wife. Curtis E., Sr., applied for letters of administration on the estate of Johannah, declaring, under oath, therein that he was her widower. He received an engrossed copy of resolutions passed by a lodge of which he was a member, extending sympathy and condolence on the death of his wife, and he brought such copy home to the children. He directed her name, as Johannah Robinson, to be engraved upon the plate of her coffin, and an inscription to be engraved on her monument in which she was declared to be his wife, and caused to be published an obituary notice of her death, naming her as "Johannah, beloved wife of C. E. Robinson." A common law marriage was thus established, and such marriages are valid in this State. *Port* v. *Port,* 70 Ill. 484; *Elzas* v. *Elzas,* 171 id. 632.

The finding of the chancellor said Curtis E., Sr., and said Johannah, were lawfully married after the death of said Schoeninger, and that said Curtis E., Sr., acknowledged each of the appellee children as his children, was abundantly sustained by the proofs. The appellee children were properly regarded by the chancellor as the legitimate children and legal heirs of said Curtis E. Robinson, Sr.

The decree of the circuit court is affirmed.

*Decree affirmed.*

CARTWRIGHT and HAND, JJ., dissenting.